MARILYN MCLEON, PRISCILLA BRADLEY, CHARLENE SINGLETARY, CLARENCE HARRIS, DIANE WATSON, PAMELA KNIGHTEN, LEON ROBERTS AND EMAKUAL BOURGEOIS
v.
VULCAN CHEMICALS.
No. 2006 CA 0662, C/W 2006 CA 0663-0666.
Court of Appeals of Louisiana, First Circuit.
September 14, 2007.
NOT DESIGNATED FOR PUBLICATION
JAY A. PARKER, STEVE M. MARKS, Counsel for Plaintiff/Appellant, James Penton.
FRANKLIN G. SHAW and CHARLES S. LONG, Counsel for Plaintiffs/Appellants Shelia Piper and Ronnie Vallery.
BRADLEY C. MYERS and FRANCIS H. LOCOCO, Counsel for Defendant/Appellee Vulcan Materials Company.
JOHN DALE POWERS, ANDREW P. SELLERS, Counsel for Defendant/Appellee Industrial Coatings Contractors, Inc.
Before: PARRO, KUHN, and DOWNING, JJ.
KUHN, J.
Plaintiffs-appellants, Shelia Piper, James Penton, and Ronnie Vallery, appeal the trial court's judgment, incorporating a jury's verdict, which awarded damages for personal injuries each sustained as a result of their exposure to a chemical release from the facilities of defendant-appellee, Vulcan Materials Company (Vulcan), and for which it and defendant-appellee, Industrial Coatings Contractors, Inc. (ICC), stipulated to their liability. Appellants aver that the jury's awards of general damages were abusively low.[1] We affirm.
General damages are those which may not be fixed with pecuniary exactitude; instead, they "involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms." Kaiser v. Hardin, 06-2092, p. 9 (La. 4/11/07), 953 So.2d 802, 808-09. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Than v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. 1993), cert denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
Vast discretion is accorded the trier of fact in fixing general damage awards. La. C.C. art. 2324.1. This vast discretion is such that an appellate court should rarely disturb an award of general damages. Thus, the role of the appellate court in reviewing general damage awards is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Kaiser, 06-2092 at p. 9, 953 So.2d at 808-09.
The initial inquiry, in reviewing an award of general damages, is whether the trier of fact abused its discretion in assessing the amount of damages. It is only after a determination that the trier of fact has abused its "much discretion" that a resort to prior awards is appropriate, and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion. Id., 06-2092 at pp. 9-10, 953 So.2d at 809.
The facts giving rise to this litigation are well known to the parties and are not in dispute insofar as liability has been stipulated. After a twenty-day trial on the issue of damages and medical causation, we simply iterate the following salient facts: on April 3, 2001, an accident occurred at the Vulcan premises, which resulted in the release of a mixture of chemicals from a reactor in the chloromethane production unit. The parties all agree that hydrochloric acid and four chlorinated organic compounds were released; they dispute whether unreacted chlorine and carbon particulates were also included in the released chemical mixture, as well as the amount of each chemical released. Despite the lengthy amount of time spent at trial on the issue of what was contained in the chemical mixture that was released on April 3, 2001, the jury was presented with ample evidence of its effects on each of the appellants, including volumes of testimony by healthcare providers, as well as personal accounts from each individual and some family members. Thus, whether appellants were exposed to chlorine or carbon particulates is not diapositive of the issues raised in this appeal.

Shelia Piper's Appeal
Shelia Piper was awarded general damages totaling $10,000. The jury specified: $2,000 was for past and future disability and physical injury; $2,000 was for past and future physical pain and suffering; and $6,000 was for past and future mental anguish, fear and fright, stress, inconvenience, and loss of enjoyment of life. On appeal, Ms. Piper contends the jury's award was abusively low and failed to factor the unrebutted testimony of her healthcare provider who related the onset of previously dormant gastrointestinal problems to the chemical release.
The evidence showed that at the time of the release, the plume of released chemicals had traveled from the Vulcan facility to the Shell Chemical premises, where Ms. Piper, who was forty-nine years old, was delivering materials to sites in a golf cart in conjunction with her work as an expediter for Palla Interstate. A radio transmission advised her to evacuate and, as she did, she saw the plume of chemicals overhead. She immediately put on the five-minute respirator that she was carrying as safety equipment and drove to an evacuation point set up on the Shell Chemical premises. By the time the respirator had expired, the plume of chemicals had passed over Ms. Piper. As she inhaled, she felt dizzy. Chemicals from the plume were on her face and in her eyes because the respirator only pinched the nose, it did not cover her head. About half an hour later, the all-clear signal alerted. Ms. Piper recalled that she continued to suffer from residual exposure, including the smell of chlorine and a wetness that clung to the walls of the warehouse fromwhich she was required to remove materials for her deliveries. She washed her face and continued to work the remainder of the day despite feelings of nausea, burning sensations on her face and eyes, and numbness in her lips.
On April 20, 2001, Ms. Piper sought medical treatment from Dr. Michael Guarisco, her primary care physician, for those symptoms, as well as diarrhea that she began experiencing soon after the chemical release. A physician's assistant diagnosed her with bronchitis. Due to chronic coughing and bronchitis through May 2001, she was referred to Dr. Bernadette Hee, a pulmonary specialist, who treated her gastrointestinal complaints as well. In June 2001, Dr. Hee assessed Ms. Piper's condition as asthma or asthmatic bronchitis. By November 2001, Ms. Piper complained of increasing heartburn and postnasal drip. Dr. Hee did not treat her again after November 2001.
Because of the continued gastrointestinal symptoms  particularly those associated with gastric and esophageal reflux  in August 2002, Ms. Piper began treating with a gastroenterologist, Dr. Michael Ruth, who found evidence of erosive esophagitis, gastritis, and a small hiatal hernia. He opined that the persistent vomiting initiated by the April 3, 2001 chemical exposure could have exacerbatedMs. Piper's tendency toward gastric and esophageal reflux, and either caused the hiatal hernia or made a preexisting one hurt or become larger. But Dr. Ruth admitted his theory that vomiting caused a hiatal hernia was controversial.
In July 2003, Ms. Piper was again examined by Dr. Guarisco. Although her asthma was stable, she continued to complain of chronic chest and abdominal discomfort, shortness of breath, and gastrointestinal symptoms.
In addition to a chronology of her treatment, the jury also heard that Ms. Piper was a one-pack-a-day smoker, who had a difficult time giving up the habit despite numerous counseling sessions by Dr. Hee. They also learned that Ms. Piper took an extraordinary amount of analgesics on a weekly basis and that she had a history of gastrointestinal symptoms that preceded the April 3, 2001 chemical exposure. Because the expert testimony established that her analgesic consumption was another potential cause for her gastrointestinal symptoms, and mindful that a trier of fact may reject in whole or part the testimony of any witness, see Scoggins v. Frederick, 98-1814, p. 15 (La. App. 1st Cir. 9/24/99), 744 So.2d 676, 687, writ denied, 99-3557 (La. 3/17/00), 756 So.2d 1141, the jury was not manifestly erroneous in apparently concluding that the April 3, 2001 chemical release was not the medical cause of her gastrointestinal complaints. See Stobart v. State, 617 So.2d 880, 882 (La. 1993).
The jury could have believed that the bronchitis with which she was diagnosed in May 2001 and the asthma from which she suffers were conditions that were exacerbated by the chemical exposure. Considering this record, we cannot say that the award of $10,000 in general damages was below that which a reasonable trier of fact could assess for the effects of the particular injuries Ms. Piper suffered as a result of her exposure to the chemical mixture on April 3, 2001. The award of general damages is not abusively low so as to warrant interdiction of the verdict rendered after the jury listened to weeks of testimony, including detailed medical assessments of Ms. Piper's condition.

James Penton's Appeal[2]
James Penton was awarded general damages totaling $12,500. The jury specified: $3,250 was for past and future disability and physical injury; $3,250 was for past and future physical pain and suffering; and $6,000 was awarded for past and future mental anguish, fear and fright, stress, inconvenience, and loss of enjoyment of life. On appeal, Mr. Penton points to the jury's awards of past medical expenses in the amount of $5,630 and future medical expenses of $11,427 to assert that the award of $12,500 in general damages was an abuse of discretion.
Initially we note that neither the past nor the future medical expense awards were appealed by any party and, therefore, are not properly within the scope of our appellate review. But Mr. Penton relies heavily on these awards in his challenge of the jury's quantum of general damages. He contends, "It appears that the jury's award for past medical expenses included all incurred healthcare costs (as submitted by plaintiff), except Dr. Scrignar ($1,737.10), Dr. Rostow ($6,050.00), Healthsouth-MRI ($1,187.00) and Dr. Morris ($773.00)."
Our review of the record shows that it is not evident whether the jury awarded all the amounts each healthcare provider charged as submitted by Mr. Penton or a portion of each. For example, the jury may have concluded that the amount of $897 charged by Dr. Stanley Peters was not wan-anted. Dr. Peters, accepted as an expert in otolaryngology, did not examine Mr. Penton until five months after the chemical exposure. He diagnosed Mr. Penton with rhinitis and questionable bronchitis. There was a gap in treatment of nearly two years, at which time Dr. Peters suspected an allergic component to Mr. Penton's continued symptoms. Dr. Peters advised the jury that Mr. Penton did not undertake the recommended allergy testing he suggested. Thus, the jury could have limited past medical expenses to a portion of Dr. Peter's bill.
By way of another example, the jury may have awarded less than the full amount of $1,866 that pulmonologist, Dr. William Erwin, charged. Like Dr. Peters, Dr. Erwin first saw Mr. Penton five months after the chemical release. He diagnosed Mr. Penton as suffering from chemical-induced bronchitis that resulted in bronchospastic illness. Dr. Erwin told the jury that Mr. Penton had an abnormal pulmonary function test on September 25, 2001; but the pulmonary function test performed on November 1, 2001 showed Mr. Penton's lung function had improved to a normal range. An office examination the following month likewise revealed normal physical and lung findings. When asked for a reason that Mr. Penton continued to complain of shortness of breath, pointing out that Mr. Penton was about twenty pounds overweight, Dr. Erwin suggested that it may be a result of a deconditioned body for which he recommended aerobic conditioning. Clearly, the jury could have believed that Mr. Penton had recovered from the chemically-induced bronchitis well before October 2003 when the pulmonologist discontinued treatment and limited its award of past medical expenses accordingly.
Because we do not have an itemized breakdown of the jury's basis for concluding that Mr. Penton is entitled to $5,630 in past medical expenses, we cannot assume as Mr. Penton suggests that the total sums necessarily reflect the jury's implicit findings accepting specific ailments and rejecting others. Indeed, anything within the range of $0 to $15,536.63, the amount Mr. Penton claimed, is supportable by the evidence in the record.
Insofar as the jury's award of future medical expenses, Mr. Penton again attempts to qualitatively determine the injuries the jury concluded he suffered based on the jury's award of $11,427. He asserts:
It appears that the jury's award for future medical expenses included healthcare costs (as submitted by plaintiff), except Dr. Scrignar ($7,800.00), Dr. Rostow ($1,700.00), psychiatric medicines ($914.28), and shortness of breath aerobic conditioning ($1,600.00).[3] Subtracting these sums from $23,671.92 [the total amount submitted by plaintiff] results in a remainder of $11,657.64. The jury awarded $11,427.00. Such an allocation suggests that the jury recognized and accepted plaintiffs claim for permanent injury to his eyes and chronic injury to his sinuses (which is consistent with the jury's award for past medical expenses) and awarded future medical expenses from those injury areas. The jury apparently did not, however, accept plaintiffs claims for his psychological injuries and thus, did not award future medical expenses for these areas of injury. (Footnote added; footnote omitted.) Mr. Penton then notes that in this appeal he does not challenge the jury's ostensible decision not to award damages for either psychological injuries he may have sustained or aerobic conditioning he may need.
Based on our review of the record, we do not agree that Mr. Penton's assumptions necessarily reveal the factual determinations the jury made on the injuries he sustained or the medical expenses he may incur in the future as a result of his injuries. It is equally as plausible that the amount of $11,427 included psychotherapy rendered by psychiatrist Dr. C.B. Scrignar ($7,800), one year of Lexapro ($914), a medicine used to treat depression, 20 weeks of shortness-ofbreath therapy ($1,600), and 14 weeks of aerobic conditioning sessions ($1,120), which would total $11,434. Because the basis for the past medical expenses is not conclusively established, the basis for the future medical expenses is not necessarily determinable either. And as with the past medical expenses, the jury was free to fashion an award for amounts less than the totals requested by Mr. Penton. Therefore, any award ranging from $0 to $23,671.92 is supported by the record. As such, we cannot agree with Mr. Penton that the injuries the jury relied upon in rendering its general damages award limits our review to those injuries associated with dry eye syndrome and chronic sinus complaints. For these reasons, we find no merit in Mr. Penton's assertions that the general damages award was somehow circumscribed by the jury's medical expense awards, and we turn now to a summary of the evidence the jury was presented upon which it could base a general damages award.
Mr. Penton was working as a safety man for Shaw Constructors at Shell Chemical across the street from Vulcan on April 3, 2001. He was walking toward the orientation trailer to tend to duties associated with training new employees when he was exposed to the chemicals. He started gasping for air and his sinuses and eyes burned. He was carrying personal protection equipment that included a mouth-bit respirator. Mr. Penton removed the plastic that covered the mouthpiece cover, unwrapped the nose clip string, bit on the respirator, and put on the nose clip. He estimated that it took him between ten and twenty seconds to activate the respirator, during which time he could not breathe. Although he was wearing protective glasses, they did not prevent his eyes from tearing. He proceeded to an evacuation point and along the way noticed that others were not wearing their respirators; so he removed his. At the evacuation point, after he called his wife and advised her of his well-being, he resumed his duties as a safety person. Mr. Penton worked the remainder of the day.[4]
About two weeks after the chemical exposure, Mr. Penton, who was twentynine at that time, sought medical care from Dr. Andrew Kucharchuk. In September 2001, he treated with ophthalmologist Dr. Russell Saloom, who diagnosed Mr. Penton with dry eye syndrome. He prescribed eye drops and eventually inserted punctual plugs, a procedure he perfonned in his office, which assisted in tear production. Dr. Saloom testified that on January 20, 2004, although Mr. Penton continued to complain about eye irritation and dryness, he indicated that it was not very bothersome anymore because he had become used to it. Dr. Saloom continued to treat Mr. Penton through February 2004.
Mr. Penton treated with Dr. Peters for sinus-related complaints and with Dr. Erwin for breathing problems as detailed earlier. In November 2001, Mr. Penton commenced treatment with a psychologist and, commencing in June 2003, began psychotherapy with psychiatrist, Dr. Scrignar. Based on his examination, a battery of evaluative tests, and a review of his medical and psychiatric histories, Dr. Scrignar opined that Mr. Penton was suffering from a generalized anxiety disorder and major depression. The psychiatrist indicated that one of the symptoms of anxiety is an altered breathing sensation, which would account for Mr. Penton's continued feelings of shortness of breath upon exertion. He opined that more likely than not the psychiatric injuries were caused by the April 3, 2001 chemical exposure. Dr. Scrignar had an optimistic prognosis, pointing out that since he had started psychotherapy, Mr. Penton had made marked improvement.
We additionally note without the elaborate detail provided to the jury during the twenty-day trial that Mr. Penton sought treatment from numerous other healthcare providers including hospital care, a urologist to address a claim that the erectile dysfunction from which he suffered was a result of the chemical exposure, and routine physicals for employment applications. The jury was presented with evidence of a young man, who experienced sinus and dry eye symptoms after the exposure. Although Dr. Saloom indicated that the dry eye syndrome was a permanent condition, by January 2004, Mr. Penton apparently had learned to live with it. Thus, the jury may have concluded that any pain and suffering Mr. Penton had endured as a result of the dry eye syndrome was alleviated by January 2004, when he indicated to his doctor that it did not bother him.
By October 2003, Mr. Penton's pulmonologist could not assess the basis for his continued complaints of shortness of breath and suggested that his deconditioned body may have been the cause. For that, Dr. Erwin recommended aerobic conditioning. Dr. Scrignar suggested a correlation between the anxiety disorder from which Mr. Penton suffered and the continued complaints of shortness of breath upon exertion. Thus, the jury may have concluded that a course of either short-term aerobic conditioning or psychotherapy was warranted to alleviate Mr. Penton's persistent feelings of shortness of breath.
Based on the record as a whole, we cannot say that this jury, which listened to the testimony of the numerous medical and healthcare providers who treated Mr. Penton, abused its vast discretion in awarding $12,500 in general damages to a person who was exposed for between ten and twenty seconds to the chemical mixture released on April 3, 2001. It appears the jury did not believe that Mr. Penton suffered residual effects that were beyond treatment. Although Mr. Penton asserts the verdict establishes with certainty that the jury found he had specific permanent conditions warranting a greater general damages award, considering the record as a whole, we find no error.

Ronnie Vallery's Appeal
Ronnie Vallery was awarded general damages totaling $100,000. The jury specified: $30,000 was for past and future disability and physical injury; $30,000 was for past and future physical pain and suffering; and $40,000 for past and future mental anguish, fear and fright, stress, inconvenience, and loss of enjoyment of life. On appeal, Mr. Vallery contends the jury's general damage award was abusively low considering that he sustained dry eye syndrome, which is a permanent condition, as well as permanent damage to his sinuses.
On April 3, 2001, Mr. Vallery, the fifty-four-year-old owner of a trucking business, was en route with his second load of sand for delivery to the Vulcan facility. He was on the roadway that entered the Vulcan premises  not quite to the guarded, check-in gate  when he heard two booms. Off to his right, on the Vulcan premises, he saw two clouds of chemicals merge together, fall downward, and spread on the ground. As he tried to back up his truck and trailer to avoid emersion in the cloud, the trailer jackknifed. Mr. Vallery could no longer see because his truck had become enveloped in the cloud. He became frightened, worrying about whether it would catch on fire or explode, and stopped his truck. He sat in the cab for between one and two minutes when he noticed the chemicals had begun seeping into the truck through the cracks and floorboard. Feeling that he was not safe in the confines of the vehicle, Mr. Vallery opened the truck door to exit. As he came out, he missed the step, twisting his ankle and hitting his knee.
Mr. Vallery began to run toward his left in a direction that was away from the cloud. He ran approximately fifty to sixty feet until he could see he was no longer in the cloud. He sat in a ditch and tried to catch his wind. He felt nauseated and thought he was going to pass out. After a period of time, someone he assumed was a safety person advised Mr. Vallery to follow him to a Vulcan first aid station. There, he was given something to drink, and his blood pressure was checked. He complained of a runny nose and watering, burning eyes.
After he was released from the first aid station, Mr. Vallery went back to his truck and drove through the guarded check-in gate. As he backed up to dump his load, a big ball of white foam came up into his mouth. He knew something was wrong and returned to the first aid station. The foam was evaluated, and Mr. Vallery was advised to go to the hospital. He was driven to St. Elizabeth's Hospital in Gonzales, where a breathing treatment and bronchodilator were administered. On April 12, 2001, Mr. Vallery returned to St. Elizabeth's Hospital after he had once again experienced a ball of white foam in his mouth.
Mr. Vallery sought treatment from family practice physicians, Dr. Richard Streb and Dr. John Fraiche, commencing on April 9, 2001, for continued complaints of eye burning, irritation, and redness, a scratchy throat, chest tightness, fatigue, loss of appetite, and headaches. During May, he began to complain of continued pain in his knee and ankle. Dr. Fraiche turned over Mr. Vallery's orthopedic care to Dr. W. Joseph Laughlin. Dr. Laughlin examined Mr. Vallery in August 2001. He concluded that Mr. Vallery had a mild sprain of his inner knee and a high ankle sprain. By December 2001, Mr. Vallery's condition had healed, and he was released from Dr. Laughlin's care.
Commencing in January 2004, Dr. Saloom treated Mr. Vallery for continuous complaints of burning, irritation, and redness of his eyes and concluded that he was suffering from dry eye syndrome. Dr. Saloom gave Mr. Vallery some lubricating drops to place in his eyes to alleviate pain. Based on the history Mr. Vallery had provided to him, Dr. Saloom opined that the dry eye syndrome was a result of Mr. Vallery's chemical exposure. In February 2004, Dr. Saloom placed permanent punctual plugs into Mr. Vallery's eyes.
Dr. Saloom admitted that nothing about the dry eye syndrome Mr. Vallery suffered from uniquely identifies a chemical exposure as the only possible cause. He explained that dry eye syndrome can also be caused by age and conceded that he was unable to rule out aging or any other potential cause as a possible basis for Mr. Vallery's manifestation of the permanent eye problem. In reviewing Mr. Vallery's prior medical history, Dr. Saloom noted a complaint of redness before April 3, 2001 had been indicated by another healthcare provider.
Upon referral from Dr. Fraiche, in April 2003, Mr. Vallery began receiving medical treatment from Dr. Peters to address his continuous sinus complaints which included congestion, postnasal drip, and headaches. Dr. Peters noted that Mr. Vallery had several anatomical defects in his nose that exacerbated his sinus problems. Although he had nasal congestion, which can accompany sinusitis, and a CT scan showed sinus disease, Dr. Peters was concerned about the underlying cause of persistent complaints of headaches. He referred Mr. Vallery to neurologist, Dr. Maria Palmer, who found no neurological basis for the headaches and concluded they were sinus related. In light of the chronic nature of the headaches, Dr. Peters believed that they may have had an allergic component and recommended allergy testing, but Mr. Vallery did not pursue that option. Comparing a January 2004 CT scan with one taken in May 2004, Dr. Peters noted improvement in the sinuses and no blockage. Because of Mr. Vallery's continued complaints of sinus symptoms, Dr. Peters recommended surgery, but as of the date of trial, Mr. Vallery had declined to undergo the procedure.
Considering the entire record, particularly the medical evidence outlined above, we do not find that the jury abused its vast discretion in awarding $100,000 in general damages to Mr. Vallery. At the onset of the dry eye syndrome, Mr. Vallery was fifty-four years old and the jury could have reasonably inferred that aging was a cause of the condition. It was also within the jury's purview to have determined that if Mr. Vallery underwent the sinus surgery Dr. Peters recommended, his chronic sinus complaints would abate. Mindful that Mr. Vallery was not wearing a respirator at the time of his exposure and that he remained in the cloud for an extended duration, we find no error in the jury's award of $100,000.
For these reasons, the trial court's judgment incorporating the jury's verdict is affirmed in compliance with La. URCA Rule 2-16.1.B. Appeal costs are assessed against plaintiffs-appellants, Shelia Piper, James Penton, and Ronnie Vallery.
AFFIRMED.
NOTES
[1] This litigation involves the claims of a multitude of plaintiffs. The parties agreed to try ten plaintiffs at a time. In this particular group of ten plaintiffs, appellants assert it was fundamental error for the trial court to conduct a bifurcated trial with their claims heard by the jury and those, of the five plaintiffs whose damages were less that $50,000 heard simultaneously by the judge. The gist of their complaint is that the jury "was bombarded by accusations that the claims at issue were driven by attorney greed," and that appellees "began the assault with references to bench trial plaintiffs whose claims they contended were fraudulent and ... subsequently were dismissed during the proceedings." Urging prejudicial error, they seek a de novo review of the evidence. The trial court conducted a single proceeding pursuant to an order of this court. In consideration of a writ taken on the issue of the trial court's acceptance of stipulations that the claims of five of the ten plaintiffs scheduled for trial before the jury were less than $50,000 which, therefore, warranted a bench trial, see La. C.C.P. art. 1732(1), another panel of this court found no abuse of discretion. But it ordered "the claims of all ten plaintiffs are to proceed in the same, single proceeding, with these five plaintiffs' claims bifurcated and to be determined by the trial court." See In re: Vulcan Litigation April 2001 Incidents, 04-1486 (La. App. 1st Cir. 7/2/04)(an unpublished writ action), writ denied, 04-1695 (La. 7/8/04), 877 So.2d 986. We find no error with this determination. See La. C.C.P. art. 1736; see also champagne v. American Southern Ins., 295 So.2d 437 (La. 1974) (some issues may be tried by a jury while others in the same trial may be decided by the judge). Moreover, insofar as the appellees' arguments made in the presence of the jury, we note the record is replete with admonitions to the jury, including in the jury instructions, advising that the arguments of counsel were not to be considered as evidence, and that a verdict could only be founded on testimonial and documentary evidence. Additionally, the only non jury plaintiff whose case was tried in the presence of the jury gave testimonial evidence of the same nature as the jury plaintiffs, and the trial judge did not announce his decision until after the jury's verdict had been returned. Accordingly, we find no prejudice and decline to conduct a de novo review.
[2] Mr. Penton contends the trial court erred when it permitted appellees to argue and introduce testimony about the installation of a containment system by Vulcan to the chloromethane production unit after April 3, 2001, to avoid a future release of chemicals into the atmosphere, urging it is inadmissible evidence of subsequent remedial efforts under La. C.E. art. 407. Article 407 states in relevant part, "In a civil case, when, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event." Since the parties have stipulated to appellees' liability, Article 407 is inapplicable. Moreover, we note the trial court admonished the jury to draw no inferences from the testimonial evidence of subsequent remedial measures in fashioning its awards. Lastly, while we agree the remedial measures were not relevant, we cannot say that either the trial court's admission of such evidence or the references made by attorneys in opening statements was so prejudicial as to warrant reversal of the jury's awards of damages. See La. C.E. arts. 402 & 403.
[3] In fact, Dr. Erwin testified that aerobic conditioning would cost about $40 per session and that Mr. Penton would need to participate twice a week for four to six months, amounting to total expenses of between $1,280 and $1,920.
[4] Mr. Penton discontinued employment on the following day for reasons not related to the chemical release. He testified that but for the termination, he would have returned to work the following day.